IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEBRASKA

| | |
|---|---|
| TERRI SUE INGRAM,<br><br>　　　　　　　Plaintiff,<br><br>vs.<br><br>CAROLYN W. COLVIN, Acting Commissioner of the Social Security Administration,<br><br>　　　　　　　Defendant. | 4:14-CV-3036<br><br>MEMORANDUM AND ORDER |

　　　This matter is before the Court on the denial, initially and upon reconsideration, of plaintiff Terri Sue Ingram's application for disability insurance benefits under Title II of the Social Security Act, 42 U.S.C. § 401 *et seq*. The Court has considered the parties' filings and the administrative record. For the reasons discussed below, the Commissioner's decision is affirmed.

I. PROCEDURAL BACKGROUND

　　　Ingram applied for disability insurance benefits on January 25, 2011. T58, 106.[1] Her claim was denied initially and on reconsideration. T106–110. Ingram appealed and requested a hearing from an administrative law judge (ALJ). T133–34. The ALJ held a hearing on September 19, 2012. T55–105. In a decision dated September 26, 2012, the ALJ found that Ingram was not disabled as defined under 42 U.S.C. §§ 416(i) or 423(d), and therefore not entitled to benefits. T55–74.

　　　Disability, for purposes of the Social Security Act, is defined as the inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months. 42 U.S.C. §§ 416(i) & 423(d).

　　　To determine whether a claimant is entitled to disability benefits, the ALJ performs a five-step sequential analysis. 20 C.F.R. § 404.1520(a)(4). At

---

[1] All citations to the administrative record (filings 16 through 16-10) are given as "T [Transcript]" followed by the page number.

step one, the claimant has the burden to establish that she has not engaged in substantial gainful activity since her alleged disability onset date. *Cuthrell v. Astrue*, 702 F.3d 1114, 1116 (8th Cir. 2013). If the claimant has engaged in substantial gainful activity, she will be found not to be disabled; otherwise, at step two, she has the burden to prove she has a medically determinable physical or mental impairment or combination of impairments that significantly limits her physical or mental ability to perform basic work activities. *Id.*

At step three, if the claimant shows that her impairment meets or equals a presumptively disabling impairment listed in the regulations, she is automatically found disabled and is entitled to benefits. *Id.* Otherwise, the analysis proceeds to step four, but first, the ALJ must determine the claimant's residual functional capacity (RFC), which is used at steps four and five. 20 C.F.R. § 404.1520(a)(4). A claimant's RFC is what she can do despite the limitations caused by any mental or physical impairments. *Toland v. Colvin*, 761 F.3d 931, 935 (8th Cir. 2014). At step four, the claimant has the burden to prove she lacks the RFC to perform her past relevant work. *Cuthrell*, 702 F.3d at 1116. If the claimant can still do her past relevant work, she will be found not to be disabled; otherwise, at step five, the burden shifts to the Commissioner to prove, considering the claimant's RFC, age, education, and work experience, that there are other jobs in the national economy the claimant can perform. *Id.*; *Jones v. Astrue*, 619 F.3d 963, 971 (8th Cir. 2010).

Ingram alleged disability primarily as a result of fibromyalgia. T60–61, 77, 106, 109. She alleged a disability onset date of March 1, 2010. T58, 175. At that time, Ingram was 35 years old. T109. The ALJ found that, based on her earnings record, Ingram could remain insured through September 30, 2015. T58. Thus, the question before the ALJ was whether Ingram had demonstrated that she was disabled for some period of not less than 12 months from between March 1, 2010 to September 30, 2015.

At step one, the ALJ found that Ingram had not engaged in substantial gainful activity following her alleged onset date. Next, at step two, the ALJ found that Ingram's fibromyalgia was a severe impairment.[2] At step three, the ALJ found that Ingram had no impairment that met or medically equaled a listed impairment. T60–62. The ALJ then determined that Ingram had the RFC to perform light work, with the following additional limitations: she was

---

[2] Ingram also alleged disability as a result of mixed personality disorder, anxiety, and depression. However, the ALJ found that these conditions imposed no more than minimal limitations on Ingram's ability to function, and were therefore non-severe. T61. Ingram has not objected to this finding, and so the Court will not discuss these conditions any further.

- 2 -

limited to occasionally lifting or carrying 20 pounds and frequently lifting or carrying 10 pounds; she could stand, sit, or walk for 6 hours out of an 8-hour workday; she could occasionally perform postural activities such as climbing, balancing, stooping, kneeling, crouching, and crawling; and she should not work on ladders or with dangerous hazards or equipment. T62.

At step four, the ALJ found, based upon the testimony of a vocational expert ("VE"), that Ingram retained the ability to perform her past relevant work as a day care worker, clinical therapist, secretary, and social services aide. T67, 99. Alternatively, the ALJ went on to find at step five that Ingram was not disabled under the Medical-Vocational Guidelines (the "Grids"), *see* 20 C.F.R. pt. 404, subpt. P, app. 2. T67. And as a further alternative at step five, the ALJ found, based on the VE's testimony, that Ingram could perform other jobs that existed in significant numbers in the national economy. T67–68, 100–101. Specifically, the VE testified and the ALJ found that Ingram could perform the full range of unskilled light and sedentary work. T67–68, 100–101. So, the ALJ found that Ingram was not disabled. T68.

On December 12, 2013, after receiving additional evidence (T6–20, 25–41, 45–54), the Appeals Council of the Social Security Administration denied Ingram's request for review. T1–4. Ingram's complaint (filing 1) seeks review of the ALJ's decision as the final decision of the Commissioner under sentence four of 42 U.S.C. § 405(g).

## II. STANDARD OF REVIEW

The Court reviews a denial of benefits by the Commissioner to determine whether the denial is supported by substantial evidence on the record as a whole. *Bernard v. Colvin*, 774 F.3d 482, 486 (8th Cir. 2014). Substantial evidence is less than a preponderance but is enough that a reasonable mind would find it adequate to support the conclusion. *Id*. The Court must consider evidence that both supports and detracts from the ALJ's decision, and will not reverse an administrative decision simply because some evidence may support the opposite conclusion. *Id.*; *Whitman v. Colvin*, 762 F.3d 701, 706 (8th Cir. 2014). If, after reviewing the record, the Court finds it is possible to draw two inconsistent positions from the evidence and one of those positions represents the ALJ's findings, the Court must affirm the ALJ's decision. *Bernard*, 774 F.3d at 486.

## III. FACTUAL BACKGROUND

Ingram has alleged disability as a result of various symptoms associated with her fibromyalgia. Briefly stated, Ingram claims that she experiences fatigue, pain, and difficulty concentrating. *See, e.g.*, T89–90, 247–48. She also alleges that she experiences pain if she sits, stands, or walks for

any significant period of time, and as a result she must frequently change positions or rest. *See, e.g.*, T89, 251. Specifically, Ingram claimed that she could walk for only 10 minutes and stand for only 15 minutes before needing to sit or lie down, and could only sit for 15 to 20 minutes before needing to stand up or lie down. T251.

At the time of her alleged onset date of March 1, 2010, Ingram was working full-time as a mental health therapist. T88, 185, 203. She had obtained a master's degree in counseling in 2009. T85. Before that Ingram worked in various positions, including full-time positions as a daycare provider and as a secretary. T85–88, 98, 203. In March 2010, Ingram was married, with two children, who were approximately 8 and 10 years old. T84. Later in 2010, she and her husband separated (and eventually divorced), and in October 2010 Ingram and her children began residing with Ingram's parents. Ingram was thus the children's primary caregiver for most of the period under consideration. T84, 403.

On April 6, 2010, Ingram met with her primary care physician, Timothy Fischer, M.D., complaining of fatigue and "terrible," diffuse muscle pain for the past several weeks, as well as fevers and difficulty sleeping. She became tearful when discussing her work, which was a "very large source of stress" for her. T265. Fischer referred her for various laboratory tests and recommended that she remain off work for the time being. T265. In the following weeks, Ingram continued to report fevers and muscle cramping, although the cramps improved somewhat when she began taking potassium supplements. Fischer continued to keep her off work, but did not prescribe any medication other than probiotics for complaints of diarrhea. On April 26, Ingram reported that she felt like she was getting better, although she still had daily muscle cramps. Fischer cleared her to return to work on May 3 without restrictions and planned to recheck her condition in 3 months. T261, 262–65, 443.

Although Ingram was cleared to return to work, there is some ambiguity in the record as to when she actually ceased working as a therapist. In a disability report from February 2011, Ingram stated that she stopped working on March 1, 2010, and that this was due to her conditions. T202–03. She testified similarly at the hearing, stating that she worked as a therapist until March 2010, at which time she "became bedridden." T88. But these claims are contradicted by the contemporaneous notes from Fischer, which suggest she was still working. *See* T261, 265, 357. And Ingram later told another doctor that she worked as a therapist until July 2010, but quit when they "'got rid of [her] whole department.'" T404. Ingram explained that, at that time, she was offered an alternative full-time position, but she declined it because she did not feel well enough to work full-time. T404.

In any event, after Fischer told Ingram that she could return to work, Ingram stopped seeing Fischer. Instead, in May 2010 Ingram began treatment with Catherine Pallas, APRN, MSN.[3] T338–39 357. Pallas met with Ingram on May 21. Ingram complained of experiencing muscle and joint pain for the past 10 weeks or more, fatigue, mental fogginess, and irritable bowel syndrome. She rated her pain as an 8 out of 10. T339–340. An examination revealed tenderness in the arms, legs, and shoulders. T338. Pallas diagnosed Ingram with fibromyalgia and prescribed Savella.[4] On June 3, Ingram telephoned Pallas, reporting adverse side effects, and Pallas advised her to taper off the Savella. T337.

Beginning in July 2010 and continuing throughout the period under consideration, Ingram worked part-time as an editor for a company that produces youth ministry materials. T88–89, 234. The job involved editing and researching, and using a computer to write and edit, and sitting for a total of about 2 hours. T234–35. Ingram explained that the job accommodated her need for frequent breaks and allowed her to choose her hours to accommodate her symptoms as needed. T235. She generally worked between 2 and 8 hours a week, averaging about 4 hours a week. *See, e.g.*, T93, 194–97, 403.

Ingram next saw Pallas on September 21, 2010. On examination, her extremities were not tender, although she moved with a guarded gait and was observed to be shifting in her chair almost continually. T335. Ingram reported that she lacked energy and was struggling to keep up with her housework and working 10 hours a week, that she could not vacuum due to back pain, and that she even had trouble washing dishes. T335–36. Pallas did not prescribe any further medication and discussed the possibility of pursuing disability. T335. Then, on October 22, Pallas drafted a letter in which she opined that Ingram "cannot do any type of physical labor outside or even inside the home for at least a full year." T321.

Other than a visit in November 2010 for a sinus infection, T333–34, Ingram did not meet with Pallas again until March 25, 2011. At her March visit, Ingram continued to report constant pain; yet she was still not taking any medications. T471–72. That same day, Pallas filled out a "Fibromyalgia Impairment Questionnaire" for Ingram. Pallas wrote that Ingram met the diagnostic criteria for fibromyalgia, and suffered from migraine headaches

---

[3] Pallas is an advanced practice registered nurse (APRN) with a Master of Science in Nursing (MSN).

[4] Savella (milnacipran) belongs to the same class of medications as many antidepressants and is used to treat fibromyalgia. U.S. Nat'l Library of Med., Nat'l Insts. of Health, MedlinePlus, *Milnacipran*, https://www.nlm.nih.gov/medlineplus/druginfo/meds/a609016.html (last visited March 19, 2015) [hereinafter "MedlinePlus"].

and irritable bowel syndrome. Pallas opined that Ingram's prognosis was poor, considering the severity of Ingram's reported symptoms, which Pallas believed were reasonably consistent with her condition. T350–51.

Among various responses on the questionnaire, Pallas opined that in an 8-hour day, Ingram could only sit, stand, and walk for 0 to 1 hour; that Ingram could not sit, stand, or walk continuously in a work setting; and that Ingram would need to get up and move around every 20 minutes. T353. Pallas wrote that Ingram could occasionally lift up to 10 pounds, but never more, and could occasionally carry up to 5 pounds, but never more. T353. And Pallas believed Ingram was "[i]ncapable of even 'low stress' jobs." T353. Finally, Pallas opined that Ingram would frequently need to take 15-20 minute breaks, and that Ingram's symptoms would cause her to miss work more than 3 times a month. T354.

Also in March 2011, Ingram completed a form describing her symptoms and daily activities. T220. Ingram would get her children ready for school and drive them there. She would take a nap when she returned home, then try to do laundry or shopping, or if she was not too "foggy," some editing work. T220. In the afternoon Ingram would pick up her children from school but by then her "energy [was] pretty much gone." T220. She could drive most days, but some days she found her reflexes were too slow from fatigue and on those days she would arrange for rides. Ingram's mother did most of the cooking, but that was because her mother's kitchen was disorganized and Ingram had difficulty finding what she needed. But Ingram also stated that she prepared her own meals, and sometimes prepared her children's meals. Ingram could wash dishes, but usually found it painful by the end. She could only vacuum half a room at a time and found pushing the vacuum painful. Ingram found using the stairs painful, and could do light housework but not "major scrubbing [or] cleaning" as these were too painful. T220.

Ingram's hobbies included reading and making jewelry. She was "not too limited with the reading" although she had "foggy days" when she was unable to read. T221. Ingram made 1 or 2 pieces of jewelry every couple of weeks; after making these she would feel pain in her shoulders and hands. She attended church weekly and sang in the praise team, and attended rehearsal once a week (although at times she was too tired to attend rehearsal). T221.

Ingram's description of her symptoms was consistent with her previous reports. She reported that her sleep was not restorative and she was fatigued; she experienced debilitating pain on a daily basis; and she had difficulty sitting, standing, and walking for any length of time without pain. T221–22. Despite these symptoms, Ingram was still not taking any medications. T223.

In April 2011, Ingram underwent a consultative physical examination with Jared Adams, M.D. She continued to report similar symptoms, and rated her pain as 15 out of 10. However, she was not taking any medications. T357–59. On examination, Ingram reported pain in all 18 trigger points for fibromyalgia. However, Adams noted that she also reported pain in general throughout her body and with any touching. T361. Adams noted that fibromyalgia is diagnosed based on symptoms rather than any specific laboratory or diagnostic test, and that he could not rule out or completely verify the diagnosis. He concluded:

> Unfortunately this makes her exam somewhat inconclusive as diagnostically she appears to have fibromyalgia and its associate[d] signs and symptoms, however, subjectively it appears that in her personal life, this is not preventing her from doing activities such as [activities of daily living], caring for children, and should not likely interfere with her . . . job as an editor.

T362.

In June 2011, Ingram began treatment with David Rutz, M.D. She was still not taking any medication and her June visit was primarily to address a sinus infection. T393. In July 2011, Rutz evaluated Ingram, noted the presence of multiple tender points on examination, and diagnosed her with fibromyalgia. Rutz began Ingram on a prescription for Lyrica and discussed the use of other treatments such as stimulants and the occasional use of analgesics.[5] T393.

On July 15, 2011, Ingram called Rutz and reported side effects from the Lyrica, including wooziness, headaches, and fatigue. Rutz instructed her to decrease the dosage. Three days later Ingram reported that the side effects had resolved and Rutz instructed her to try increasing it to a level still below the initial prescription. Three days after that, Ingram reported that the increased dosage was again causing undesirable side effects, so Rutz discontinued the medication. T437.

On July 28, 2011, William Stone, Jr., Ph.D., conducted a psychological consultative examination of Ingram. Although Stone's focus was Ingram's psychological symptoms, he made certain observations that pertain to her fibromyalgia symptoms. First, Stone observed that despite Ingram's reports

---

[5] Lyrica (pregabalin) is used to treat neuropathic pain and fibromyalgia. MedlinePlus, *Pregabalin*, https://www.nlm.nih.gov/medlineplus/druginfo/meds/a605045.html (last visited March 19, 2015).

of ongoing pain, she evidenced no involuntary indicators of pain or discomfort. T401, 406. Stone observed that Ingram was living with her parents, and did not clean the house generally, but cleaned her own room, her daughters' room, and their bathroom, and that she was able to care for her children "without difficulty." T404. Ingram stated she liked to watch television, that she read "a lot" and was in a book club that met once a month. T404. She liked to crochet and make jewelry, and was able to make jewelry by "'forcing' herself to do so;" and she was making some for her daughters' school fundraiser. T404. After reviewing Ingram's hobbies and activities of daily living, Stone noted that Ingram "describes a range of leisure and social activities despite a level of pain and discomfort she finds prohibitive for activities such as employment." T406. And Stone "could not avoid observing that Ms. Ingram was smiling and cheerful much of the time during the interview and that the parameters and demands for being interviewed and providing information in an office are highly similar to the parameters of office attendance for her profession." T406.

Ingram met with Rutz again in August 2011. Rutz began prescribing Cymbalta and methylphenidate.[6] In September, Ingram reported to Rutz that the Cymbalta had helped with her anxiety and depression but had not relieved her pain or fatigue. The methylphenidate was making her tremulous, and she agreed to try a lower dose. Rutz prescribed tramadol for pain.[7] Ingram saw Rutz again November 1 for a follow-up. She reported that she had found a significant benefit from the tramadol. Ingram stated if she took too many, she became "loopy," but Rutz noted the medication was tolerated reasonably well. T436–37. Rutz did not adjust her medications and determined that they should continue the tramadol as part of a plan to proceed to narcotic treatment for chronic pain. T437. Rutz also interviewed Ingram for 35 minutes and filled out a form for Social Security benefits, but this form does not appear in the record. On November 30, Ingram returned to Rutz, reporting that the methylphenidate was helping her fatigue, the tramadol continued to help, and the Cymbalta had improved her mood. T436.

---

[6] Cymbalta (duloxetine) is used to treat depression, anxiety, and fibromyalgia. MedlinePlus, *Duloxetine*, https://www.nlm.nih.gov/medlineplus/druginfo/meds/a604030.html (last visited March 19, 2015). And methylphenidate (sometimes sold as Ritalin) is a stimulant used primarily to treat attention deficit hyperactivity disorder. MedlinePlus, *Methylphenidate*, https://www.nlm.nih.gov/medlineplus/druginfo/meds/a682188.html (last visited March 19, 2015).

[7] Tramadol is used to relieve moderate to moderately severe pain. MedlinePlus, *Tramadol*, https://www.nlm.nih.gov/medlineplus/druginfo/meds/a695011.html (last visited March 19, 2015).

Rutz continued these medications and changed her from a monthly to 3-month follow-up. T436.

Ingram next saw Rutz in February 2012. She continued to report a benefit from the Cymbalta and tramadol, but stated that she was often fatigued to the point where she had to nap for 4 hours, up to 3 to 4 times a week. The methylphenidate was helping with her fatigue but she did not use it every day. Rutz continued the other medications and recommended that she increase the daytime dose of methylphenidate to see if she could reduce her need to nap and return to a normal sleep cycle. T494.

Rutz met with Ingram again in May 2012. Ingram reported that she found marijuana to be the most helpful treatment for her fibromyalgia symptoms. Rutz wrote that he could not prescribe methylphenidate if she was using marijuana, which Ingram accepted, stating that the methylphenidate was not working that well. Rutz refilled her tramadol and cancelled the methylphenidate prescription but made no other changes to her treatment. T494. Rutz saw Ingram again in September 2012 to fill out a disability form, and continued the same medication regime. T493.

Ingram submitted two opinions from Rutz: a letter from May 2012 and an "Impairment Questionnaire" from September 2012. T468, 483. In the letter, Rutz briefly described Ingram's reported symptoms and his course of treatment. He opined that her prognosis was poor based on her lack of response and "continued fatigue and inability to sustain any type of energy expenditure which has resulted in a significant inability to maintain employment." T468. Rutz further opined that Ingram needed to rest frequently throughout the day and could not maintain "significant physical exertion" because of pain and fatigue. T468. He did not believe she could maintain full or part-time employment due to her frequent pain and fatigue. T468–69.

Rutz's opinion in the September 2012 Impairment Questionnaire was similar to his May 2012 letter, and similar to Pallas' earlier opinion. He estimated that Ingram's pain was a 7 to 8 out of 10 and her fatigue was either a 9 to 10, or maybe a 10—the form is not clear. T485. Like Pallas, Rutz estimated that Ingram could only sit, stand, and walk for up to 1 hour a day; that Ingram could not sit, stand, or walk continuously; that Ingram needed to get up and move or rest approximately every 15 to 20 minutes; and that Ingram would be absent from work more than 3 days a month. T485–86, 488–89. Rutz stated that Ingram could frequently carry and lift up to 5 pounds, occasionally carry and lift up to 10 pounds, and could never carry or lift any greater weight. T486. Rutz felt that Ingram could not perform a full-time, competitive job that required activity on a sustained basis. Unlike Pallas, he believed Ingram was capable of low-stress jobs. T488.

In September 2012, Ingram responded to a set of interrogatories regarding, among other things, her symptoms and daily activities. Her responses to these questions were essentially the same as her responses in the March 2011 form. Later that month, at the hearing before the ALJ, Ingram testified concerning her symptoms and daily activities. Again, her testimony was generally consistent with her earlier responses. *See* T89–91, 93–96, 246–254.

Following the September 2012 hearing before the ALJ, Ingram submitted several new records, including treatment notes from a new physician and a physician specializing in pain management that she began seeing in November 2012. *See, e.g.*, T26–30, 46–50. The Appeals Counsel considered all of the new records, but found that they related to a period following the date of the ALJ's hearing decision and were therefore not material. T2.

The Appeals Council will only consider additional evidence if the evidence "relates to the period on or before the date of the administrative law judge hearing decision." 20 C.F.R. § 404.970(b). Evidence that is generated after the ALJ's hearing decision may still relate to the preceding period and thus be considered material. *See Williams v. Sullivan,* 905 F.2d 214, 216 (8th Cir. 1990). However, Ingram has not objected to the Appeal Council's finding that the new records were not material, nor has she discussed the records.

## IV. ANALYSIS

Briefly stated, Ingram presents two arguments. Both concern the ALJ's determination of her RFC. First, Ingram contends that the ALJ erred in finding her to be less than fully credible in her testimony regarding the limiting effects of her impairments. Second, Ingram argues that the ALJ erred in failing to afford greater weight to, and incorporate the limitations suggested by, the opinions of Pallas and Rutz.

### A. Credibility Determination

The credibility of a claimant's subjective testimony is primarily for the ALJ to decide. *Vossen v. Astrue,* 612 F.3d 1011, 1017 (8th Cir. 2010). The ALJ's credibility determination will be upheld if the ALJ provides good reasons for discounting the claimant's subjective complaints—such as inconsistencies in the record or the factors set forth in *Polaski v. Heckler,* 739 F.2d 1320, 1322 (8th Cir. 1984)—and those reasons are supported by substantial evidence. *Grable v. Colvin,* 770 F.3d 1196, 1202 (8th Cir. 2014).[8]

---

[8] The *Polaski* factors include: (1) the claimant's daily activities; (2) the duration, intensity, and frequency of pain; (3) the precipitating and aggravating factors; (4) the dosage, effectiveness, and side effects of medication; (5) any functional restrictions; (6) the

The ALJ found that Ingram was only minimally credible in her description of the persistence, intensity, and limiting effects of her symptoms. The Court finds that the ALJ's determination was supported by appropriate reasons and substantial evidence.

First, the ALJ observed that the medical treatment Ingram received was conservative and routine in nature. T65–66. From March 2010 through July 2011, her only treatment consisted of a single brief trial of fibromyalgia medication, which she quickly discontinued after reporting adverse side effects. T337. Rutz attempted another brief trial of a different fibromyalgia medication in July 2011, but quickly discontinued it after Ingram reported side effects. T393, 437. Thereafter, his treatment was routine and conservative in nature, consisting of prescribing tramadol for pain, Cymbalta for depression, and methylphenidate for fatigue. And Ingram reported that the tramadol helped her significantly, and that the Cymbalta helped her anxiety and depression. And, for a time, she reported that the methylphenidate helped her fatigue. *See*, *e.g.*, T393, 436–37, 493–94. But, the ALJ noted, Ingram's providers did not take further steps that might be expected, such as recommending warm water therapy or referring her to a specialist such as a rheumatologist. T64–65. The ALJ also noted that Ingram's claims of debilitating pain and fatigue were inconsistent with her use of medications. Other than the brief trial of Savella in May 2010, Ingram took no medications, prescription or even non-prescription, from March 2010 through July 2011. *See* T204, 223, 230, 335, 471–72. The ALJ properly considered both Ingram's minimal treatment and limited use of medications as weighing against her credibility. *See*, *Wagner v. Astrue*, 499 F.3d 842, 851 (8th Cir. 2007); *Depover v. Barnhart*, 349 F.3d 563, 566 (8th Cir. 2003).

Substantial evidence also supports the ALJ's observation that Ingram's activities of daily living were inconsistent with her self-reported limitations. Ingram reported that she could only walk for about 10 minutes and stand for about 15 minutes before she needed to sit or lie down, and could only sit for 15 to 20 minutes before needing to stand up or lie down. *See, e.g.*, T93, 251. Despite this, Ingram was the primary caregiver for her two children. She was able to do some household chores; attend church twice a week to rehearse and sing in the praise team; spend time with friends; watch movies and read; make jewelry; and work (albeit minimally) as an editor. T66. Admittedly, Ingram claimed that some of these activities resulted in pain and fatigue, and these activities do not by themselves show that Ingram was capable of working. But the ALJ properly viewed the variety and extent of these

---

claimant's work history; and (7) the absence of objective medical evidence to support the claimant's complaints. *Polaski*, 739 F.2d at 1322; *see also* 20 C.F.R. § 404.1529(c)(3)(i–vii).

activities as inconsistent with Ingram's reportedly debilitating symptoms. *See*, *e.g.*, *Steed v. Astrue*, 524 F.3d 872, 876 (8th Cir. 2008).

The ALJ also observed that Ingram made inconsistent and exaggerated statements regarding her symptoms. *See* T66. For example, Ingram testified that in March 2010 she became "bedridden." T88. But as the ALJ noted, the record contained no treatment notes for that month, and while she did seek treatment in April, the notes do not suggest that she was bedridden. Instead, she was given minimal treatment consisting of probiotics and kept off work for a few weeks, but then released to return to work without restrictions. T66, 261, 262–65, 443. The record contains other incidents of exaggerated symptoms and inconsistences. For example, in April 2011 Ingram told the consultative examiner that her pain was a 15 out of 10. T357. Yet, as discussed above, she was not undergoing any treatment or taking any medications. The ALJ properly considered such exaggerations and inconsistencies in discrediting Ingram's testimony. *See, Grable,* 770 F.3d at 1202; *Gray v. Apfel,* 192 F.3d 799, 804 (8th Cir. 1999).

### B. Opinions of Pallas and Rutz

In determining Ingram's RFC, the ALJ gave "little weight" to the opinions of Pallas and Rutz. Instead, the ALJ credited the opinion of Gerald Spethman, M.D., a consulting physician who reviewed Ingram's file in August 2011 and generally opined that she retained the RFC to perform sedentary and light work. T65–66, T422–29. It is the ALJ's role to resolve conflicts among the opinions of various treatment providers. *Renstrom v. Astrue,* 680 F.3d 1057, 1065 (8th Cir. 2012). The Court finds that the ALJ performed this role properly and that the record supports the ALJ's decision to afford little weight to the opinions of Pallas and Rutz.

The Court begins with Rutz, as he was Ingram's treating physician and thus a "treating medical source." *See* 20 C.F.R. § 416.902. The opinion of a treating medical source is generally entitled to greater weight than other sources. *Anderson v. Astrue,* 696 F.3d 790, 793 (8th Cir. 2012). When it is supported by proper medical testing, and is not inconsistent with other substantial evidence in the record, the ALJ must give the opinion controlling weight. *Cline v. Colvin,* 771 F.3d 1098, 1103 (8th Cir. 2014); 20 C.F.R. § 416.927(c)(2). But such weight is neither inherent nor automatic by virtue of the source's status. *Cline,* 771 F.3d at 1103. And the ALJ may discount or even disregard the opinion of a treating medical source where other medical assessments are supported by better or more thorough medical evidence, or where the source renders inconsistent opinions that undermine the credibility of such opinions. *Id.* Whether granting a treating medical source's

- 12 -

opinion substantial or little weight, the ALJ must always "give good reasons" for the weight she gives. *Id.* The ALJ did so here.

First, the ALJ noted that Rutz "apparently relied quiet heavily on the subjective report of symptoms and limitations provided by the claimant, and seemed to uncritically accept as true most, if not all, of what the claimant reported." T66. And as the Court has already explained, the ALJ properly gave little weight to Ingram's subjective reports.[9] Second, the ALJ observed that Rutz's treatment notes, which reflected essentially conservative and routine treatment, do not suggest that Ingram was as limited as Rutz would later opine. Finally, the ALJ noted that Rutz was not a specialist in treating fibromyalgia. All of these were proper reasons for discounting Rutz's opinions. *See*, *Cline* 771 F.3d at 1104 (reliance on discredited subjective reports); *Anderson,* 696 F.3d at 794 (significant limitations not reflected in treatment notes or medical records); 20 C.F.R. § 404.1527(c)(5) (specialist's opinion entitled to greater weight).

The ALJ was also justified in giving Pallas' opinions little weight.[10] Pallas' October 2010 letter was drafted after having seen Ingram only twice. T335–340. And when she filled out the Fibromyalgia Impairment Questionnaire in March 2011, she had only seen Ingram twice more—and one of those times was solely for a sinus infection. T333–34. The ALJ found that Pallas had "not prescribed the type of treatment one would expect (referral to a specialist, warm water therapy, etc.) if the claimant were as limited as [Pallas] indicated." T65. This finding is supported by the record. Pallas' total treatment consisted of prescribing a single medication, which Ingram discontinued after about 2 weeks due to side effects. T337–38. After that, Pallas' treatment plan was for Ingram to limit her activities and consider pursuing disability. T335.

---

[9] The Court acknowledges that fibromyalgia is, by its nature, "an elusive diagnosis; '[i]ts cause or causes are unknown, there's no cure, and, of greatest importance to disability law, its symptoms are entirely subjective.'" *Tilley v. Astrue,* 580 F.3d 675, 681 (8th Cir. 2009). But the ALJ did not improperly fault Ingram for failing to supply objective medical evidence. Rather, the ALJ properly discredited Ingram's subjective reports on other grounds.

[10] As an APRN, Pallas was not an acceptable medical source and thus could not qualify as a "treating medical source." *Sloan v. Astrue,* 499 F.3d 883, 888 (8th Cir. 2007); 20 C.F.R. §§ 404.1502, 404.1513. The opinions from "other sources" such as APRNs should be evaluated using the same factors used to evaluate opinions from acceptable medical sources, set forth in 20 C.F.R. § 404.1527(c). Social Security Ruling 06-03p, 71 Fed. Reg. 45593-03, 2006 WL 2263437 (Aug. 9, 2006). However, these factors are not binding on the ALJ, who has greater discretion in dealing with opinions from other sources. *Tindell v. Barnhart,* 444 F.3d 1002, 1005 (8th Cir. 2006).

Moreover, Pallas' October 2010 simply recited Ingram's descriptions of her symptoms and then concluded that because Ingram's symptoms had not improved (despite the minimal treatment she had received), Ingram was unable to do "any type of physical labor." T321. Even if this opinion is given weight, Ingram's inability to perform "physical labor" hardly contradicts the ALJ's finding that she could perform sedentary work. While Pallas' March 2011 opinion is more detailed, the extreme limitations it expressed are still inconsistent with the minimal treatment Pallas provided. And like Rutz, Pallas based her assessment primarily on Ingram's subjective reports, which the ALJ found unpersuasive. In sum, the ALJ did not err in affording little weight to Pallas' findings.[11]

Conversely, the ALJ afforded significant weight to the opinion of Spethman, which generally supported the ALJ's ultimate RFC finding. The ALJ reasoned that Spethman's opinion was consistent with other substantial evidence in the record including the medical findings, Ingram's daily activities, and her lack of more aggressive medical treatment. The ALJ did not err in relying on Spethman's opinion, which was supported by a reasonable explanation. It is true that, as a general matter, the opinions of consulting professionals who have not examined a claimant do not constitute substantial evidence on the record as a whole. *Singh v. Apfel*, 222 F.3d 448, 452 (8th Cir. 2000). However, substantial evidence will support an ALJ's determination where, as here, the ALJ did not rely solely on the opinions of non-examining physicians, but also conducted an independent review of the medical evidence, as well as other evidence in the record, such as a lack of treatment and the claimant's activities of daily living. *Krogmeier v. Barnhart*, 294 F.3d 1019, 1023–24 (8th Cir. 2002); *cf. Vossen*, 612 F.3d at 1016. The ALJ properly weighed the opinions of the various sources in this case, as well as the record as a whole, and her assessment of Ingram's RFC was supported by substantial evidence.

---

[11] The ALJ also noted that Pallas' opinion may have been based on sympathy for Ingram. The ALJ explained that "[w]hile it is difficult to confirm the presence of such motive, it is more likely to occur in situations where the opinions and reports in question depart from other substantial evidence in [the] record, as in the current case." T65. Ingram critiques the ALJ's reasoning, pointing to the absence of any evidence to support such an improper motive on Pallas' part. The Court need not determine if this was error, as any error in this regard was harmless. As discussed above, there was ample cause to discredit Pallas' opinions, and the Court finds it unlikely the ALJ would have reached a different result even absent her speculation into Pallas' motives.

V. CONCLUSION

The Court has reviewed the administrative record and finds that the ALJ did not err in any of the ways asserted by Ingram. The Court finds that the Commissioner's decision was supported by substantial evidence and should be affirmed.

THEREFORE, IT IS ORDERED:

1. The Commissioner's decision is affirmed;

2. This case is dismissed;

3. The parties shall bear their own costs; and

4. A separate judgment will be entered.

Dated this 19th day of March, 2015.

BY THE COURT:

*John M. Gerrard*
John M. Gerrard
United States District Judge